## Filter v. McCabe

C.P. of Bucks County, no. 96-8836.

*Stewart Jay Eisenberg,* for plaintiff.
*John T. Carty* and *Francis John Deasy,* for defendant.

BIESTER, JR. *J.,* September 10, 1998—On June 26, 1998, we sustained the defendant's preliminary objections to the plaintiff's third amended complaint and dismissed that third amended complaint with prejudice. The plaintiff has taken a timely appeal, and we write this opinion to explain our reasons for having sustained the preliminary objections and dismissing the complaint.

That complaint alleges that Mr. Filter, on December 29, 1995, was a guest in the defendant's home, the two being neighbors, and that during the evening, the plaintiff and the defendant were alone together in the basement of Mr. McCabe's residence. We know from earlier complaints that the parties had been drinking. Apparently, at that time, they were the only two people

who remained after the party. The complaint further alleges that the defendant was two feet away from the plaintiff when the defendant witnessed the plaintiff fall to the floor and hit his head extremely hard on the bare concrete, and that as a result of that fall, the plaintiff was rendered unconscious. The complaint further alleges that the defendant decided to come to the aid of the plaintiff and tried to wake the plaintiff by tapping him on the face, and when this was unsuccessful, the defendant got a glass of water and splashed it into Mr. Filter's face.

Again, according to the complaint, after the water was splashed in Mr. Filter's face, he opened his eyes, and the defendant, taking hold of the plaintiff's arm, helped him up off the floor and aided him to a nearby couch. The defendant asked certain questions of the plaintiff to which the plaintiff was unable to respond, and the defendant was unable to communicate with the plaintiff at that time. The defendant then decided to take Mr. Filter upstairs and place him in an empty bed in the defendant's home. The defendant then left him in the bed and went to sleep himself. The complaint further alleges that Mr. McCabe did not call an ambulance or call 911 or call the plaintiff's wife or other family members in order to get medical assistance for Mr. Filter. The complaint further alleges that the fall caused a subdural hematoma to form in the plaintiff's brain which gradually grew to the point of requiring emergency brain surgery later that day and resulting in permanent brain damage to the plaintiff.

The complaint further alleges that the defendant, by discontinuing his efforts with respect to the plaintiff, without notifying anyone of Mr. Filter's need for medical assistance, thereby delayed necessary medical treatment for the plaintiff and thereby placed the plaintiff in a

worse position than when he originally came to Mr. Filter's aid. The complaint nowhere alleges that the defendant was in any way aware of a subdural hematoma having begun to form in the plaintiff's brain. Nowhere in the complaint is there any allegation specifying any special emergency medical training or medical training of any kind on the part of the defendant.

Apparently, and we know from previous complaints, the plaintiff later left the defendant's home in the early morning on his own without notifying the defendant, and was in his own home when the defendant called at approximately 9:30 a.m. on December 30, 1995, telling the plaintiff's wife that he was worried about whether her husband had made it home. During that telephone call, the defendant did not inform the plaintiff's wife that her husband had hit his head or had been rendered unconscious, or about the throwing of water on his face, or that he had helped him off the floor or placed him in bed. At 10:35 a.m., on December 30, 1995, the plaintiff's wife received a second call from the defendant. On this call, the defendant elaborated on his further conversation to say that he was worried about her husband because Mr. Filter hit the back of his head really hard the night before. As a result of that second call, the plaintiff's wife attempted to wake her husband but could not do so. She noted that her husband's pupils were fixed and dilated, and she contacted 911.

The plaintiff relies upon section 323 and section 324 Restatement (Second) of Torts. Section 323 reads as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other

for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

Section 324 reads as follows:

"One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him."

Our appellate courts have addressed the underlying philosophy of these sections of the Restatement (Second) of Torts, and have approached them cautiously. An early consideration of section 324 occurred in *Karavas v. Poulos,* 381 Pa. 358, 113 A.2d 300 (1955). In that case, a patron in a bar slipped and fell in some fashion onto the floor, and the bartender came to his assistance. The bartender picked him up and placed him on a chair beside a table. The plaintiff testified that he suffered pain and cried, "I am hurt. Take me to the hospital." Apparently, a son-in-law, pursuant to a telephone call received by his wife around 12 o'clock, went to the establishment and found his father-in-law sitting on a chair leaning on the table. The plaintiff was then taken by the son-in-law by truck to the son-in-law's home. Sometime later that day, he was taken to a hospital where it was discovered his hip was fractured. It appears that the bartender, when he heard the noise of the fall, saw the plaintiff lying on the floor, and he picked up the plaintiff, who was "white as a

ghost," and sat him on a chair. A waitress called the daughter who said someone would come for her father. The bartender then resumed his customary duties. Inter alia, the plaintiff relied upon section 324 of the Restatement (Second) of Torts, arguing that although the bartender had no duty to come to his aid, having volunteered assistance, he failed to exercise the reasonable care required in administering such assistance.

Considering section 324, the Pennsylvania Supreme Court, after noting that the Good Samaritan incurs a responsibility avoided by those who pass by on the other side, stated,

"If accepted as a correct statement of the law, it should not be extended in its application and we do not think the rule pronounced would permit the imposition of liability under the circumstances here presented."

The Supreme Court further noted that it was not discovered that the plaintiff had suffered a fracture of his hip until he was hospitalized the next day. The Supreme Court emphasized that "due care in any case is the care usually exercised by men of ordinary prudence in like cases and under like circumstances." The Supreme Court held that "we cannot find that the bartender's action was other than that which would have been undertaken by a reasonably prudent man."

Obviously, the *Karavas* case is distinguishable in many particulars from the case before us. In *Karavas,* there was an early contact to the plaintiff's family. But even after that contact, the actual extent of the plaintiff's injury was not appreciated until he was taken by the family to a hospital some seven or eight hours after the fall had occurred. What is important to note from the Supreme Court's opinion in that case is, first of all, that section 324 should not be stretched in its ap-

plication even if accepted as a correct statement of the law. And, further, that consistent with section 324, it emphasized the basic rule of due care, and that due care in any case is the care usually exercised by persons of ordinary prudence in like cases and under like circumstances.

We should interpolate at this point that while it is not included in the third amended complaint, it was alleged under verification in previous complaints that the plaintiff had been drinking, and drinking to a considerable extent while at the defendant's home. Obviously, that comes into play as one considers the fact that the plaintiff went down spontaneously without being pushed onto the floor of the defendant's home. The evaluation made of all of the circumstances of the plaintiff by the defendant must be taken in light of the fact that the plaintiff had been drinking heavily and that he went down without any external causative event.

Our Supreme Court visited section 324A in *Cantwell v. Allegheny County,* 506 Pa. 35, 483 A.2d 1350 (1984). Our Supreme Court in that case held that a complaint must contain factual allegations sufficient to establish the legal requirement that the defendant has undertaken "to render services to another which he should recognize as necessary for the protection of a third person." That is distinguished from our case. But the mental standard implicitly remains the same for section 323 as for 324A. Our Supreme Court held what amounted essentially to a requirement of foreseeability. We believe that even if a defendant has undertaken to render a service to another and the plaintiff was the person to whom those services are rendered has suffered physical harm, if there was no reason that the defendant should have foreseen that his actions were necessary for the protection of the plaintiff, no cause of action will lie.

Once again, the case of *Cantwell v. Allegheny County* is radically distinguishable from the circumstances of the instant case, but nonetheless, the rules which are enunciated by our Supreme Court seem rather clear and applicable to section 323. As one addresses the issue of foreseeability, one engages in the analysis of what is meant by the phrase "which he should recognize as necessary for the protection of a third person." Again, we believe that what is implicated is the level of comprehension in the totality of the circumstances available to this defendant with respect to the potential degree of harm and risk experienced by the plaintiff.

We have also looked at section 321 of the Restatement (Second) of Torts which provides as follows:

"Section 321. Duty to act when prior conduct is found to be dangerous

"(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

"(2) The rule stated in subsection (1) applies even though at the time of the act the actor has no reason to believe that it will involve such a risk."

While conceivably section 321 might be implicated by the circumstances in the instant case, we would note that our appellate courts have either never adopted section 321 as the law of Pennsylvania or have declined to do so. The Pennsylvania Superior Court in the case of *Glick v. Martin and Mohler Inc.,* 369 Pa. Super. 428, 535 A.2d 626 (1987) was not satisfied with the phrase "unreasonable risk" as being too vague. We would also note that section 321 in its strict application would force a court to ignore the state of mind of the defendant at the time that the original physical con-

tact with the plaintiff took place. Again, that engages the process of foreseeability and the conduct of a reasonable person under such circumstances.

We also have noted an early case of our colleague, the Honorable Isaac S. Garb, now president judge, in the case of *Reilly v. A. Duie Pyle,* 20 Bucks Co. L. Rep. 288 (1970). In that case, which addressed a set of very unusual foreseeability issues, Judge Garb noted that "conduct is negligent only if the harmful consequences thereof could reasonably have been foreseen and prevented." We believe that the point made in that sentence is that foreseeability must be taken into account as one measures the extent of the duty imposed upon a particular actor.

We have reviewed the application by Pennsylvania appellate courts with respect to sections 323 and 324. With respect to section 323, there are 104 Pennsylvania cases applying that section. Not one applies the section to a normal, lay individual under any circumstance. Forty-three of them involve medical malpractice or hospital liability cases; 12 of them involve workers' compensation and employer and employee responsibilities; three of them involve municipal liability as the result of governmental or police negligence; and four of them involve landlord and tenant. With respect to section 324, eight cases have applied section 324 in Pennsylvania, and in no instance is a normal layperson held responsible. They include a prisoner caught in a fire, a manufacturer's defect, a failure of proper meat inspection, failure to carry out a promise to pay for a student with a broken neck, an engineering firm liable for the collapse of a trench, and a city sued for a certain depression near a bridge and failure to warn or divert traffic.

Our courts have consistently taken into account the human and social consequences of the application of

148

various rules of liability. We believe that as one considers the potential for transformation of normal conduct between and among laypeople which might occur in light of application of sections 323 and 324 to their efforts of help in normal relationships, there is a high potential for thoroughly unpleasant consequences.

We believe the foregoing explains our reasoning with respect to the issues raised in the preliminary objections and explains our basis for dismissing the third amended complaint.